Good afternoon and welcome to Seattle and to our William Nakamura Courthouse. It's a pleasure to have all of you here today. This is the time set for oral argument in the case of Mark Baird v. Rob Bonta. If the council is ready to please come forward, you may do so. Good afternoon. My name is Amy Bellantoni and I represent the appellant Mark Baird. I would like to reserve 10 minutes for rebuttal, please. May it please the court. The district court decision granting summary judgment in favor of the state and denying the appellant's motion for summary judgment should be vacated. Judgment should be entered for Mr. Baird in his favor and the two criminal statutes that were challenged in this case should be enjoined with respect to open carry. The district court never addressed the threshold constitutional defect in this case. Does California's criminalization of presumptively protected conduct violate the Second Amendment? This case challenges two California laws, Penal Code 25850 and 26350, both of which criminalize presumptively protected conduct protected by the Second Amendment right to bear arms. Can I ask about you? You're using this term presumptively protected conduct. That's because the type of carry that is permitted, like if it were concealed carry, would you say it's also presumptively protected or do you just think open carry is presumptively protected? Well, I would say it's presumptively protected because the plaintiff's proposed conduct is to carry in public, which satisfies step one of the Bruin test. And for the state regulation that's being challenged to survive, there must be a longstanding national tradition that supports that regulation. So in this case, we are challenging the restraint on open carry in California. That is not to say that concealed carry is not also protected under the Second Amendment. That's just not the focus of this case. Counsel, can you tell me what level of generality I'm supposed to be looking at when we talk about the how? Could you be more specific, please? Sure. So we're talking about the how of restrictions. Are we looking at public carry? Does it matter the manner of the carry, whether it's public or open, public, concealed? At what level am I supposed to be looking at this? Well, I would say specific to this case, because these are criminal statutes, which have not yet been challenged in the Supreme Court or in this circuit, historically the challenges have been to the licensing scheme. So when it comes to challenging criminalization of a natural right, what the Supreme Court has held to be a preexisting right that existed before any form of government, there is no level of generality, whether heightened or lowered, that would pass constitutional muster. Because these statutes, by threat of criminal penalties, forbid the general public from possessing loaded firearm and from carrying openly an unloaded firearm. But then how do you reconcile that with the statement in the Bruin opinion itself that they said, obviously under Bruin the states can't ban public carry altogether, but Bruin itself said they may, quote, lawfully eliminate one kind of public carry. It seems like the proposition you just stated would be inconsistent with that part of the Bruin holding. So how do you account for that? Thank you. So footnote nine, which I believe that Your Honor is referring to, which discusses shallow issue carrying regimes and or on page 59 of the Bruin decision, which talks about a handful of southern states that passed and upheld regulations banning concealed weapons, banning carrying weapons in a stealthy manner, concealed. That was not a holding specifically. That was just the Supreme Court surveying the landscape of the history of public carry. Because in Bruin there was no challenge to a criminal statute. The challenge there was to one aspect of New York State's licensing scheme. So I'm not sure I agree with you on the characterization of what's holding and what's dictum in Bruin, but granting the point for sake of argument, we're trying to apply Bruin here. Why should we, even assuming that it's dictum, why should we disregard something that the court in Bruin said in trying to figure out how to apply the Bruin test? Certainly. Even assuming it was part of their holding, the state loses. Because when we're looking at a national historical tradition, let's even assume, which I'm not conceding, that those handful of southern states constituted a national tradition at the time. There is no evidence, in fact, the evidence points in the opposite direction, of any type of regulation, criminalization or banning or infringement on open carry. In fact, those southern states recognized that even under their own state statutes, that open carry was the mode of carry that was protected by their state constitutions. And I believe one or two of them even mentioned the Second Amendment, which the states didn't believe applied to them at the time anyway. So even assuming that was part of the holding, there's no longstanding tradition of affecting or infringing on or regulating the open carriage of weapons. In fact, the underlying rationale for the southern states' decisions and the statutes was they concealed carry and the carry of concealed weaponry, which was considered stealthy and evil at the time, was just that. And they looked down upon concealed carry. There is no such rationale for or no such holding for open carry. Can I ask you about, you have both an as-applied and a facial challenge to the restriction, correct?  Do you have an as-applied? The district court dismissed the as-applied challenge. And gave you an opportunity to amend, and you never took it. Right. So I think there was a miscommunication, to be quite honest, throughout this litigation about what the scope of the as-applied challenge was. And I think the district court interpreted the as-applied challenge to mean that Mr. Baird was challenging, the court directed us into the direction of challenging the sheriff or naming the local sheriff who would not issue open carry licenses. To that point, we're challenging facially these two criminal statutes as applied to open carry. So 25850 is a general ban on carrying a loaded handgun in public. Assuming the court finds that there's a national tradition of banning concealed carry, our focus here is as applied to open carry. So you didn't take the district court up on their offer, on her offer, is that correct? That's correct. And then here on the appellate brief, I was trying to figure out, where is your applied challenge? I don't understand where it is in your brief. Right. So it's, again, in defining the as-applied challenge as challenging the non-issuance of an open carry license in the over 200,000 population counties, we're not doing that. Because this is not a licensing challenge, this is a challenge to criminal statutes. Okay, but my problem is, in response to Judge Nelson, I thought you said you have an as-applied challenge. But I read the briefs the way Chief Judge McGeehan did. So is your answer that you don't have an as-applied challenge today? As applied to Mr. Baird's particular circumstances, living in a county of less than 200,000 individuals, that is not an as-applied challenge because we're not pursuing that because we're not challenging the licensing statute. We're challenging the criminal statute. So in challenging the criminal statutes facially, because 25850 applies to all manner of carry, it criminalizes carrying a loaded firearm in public. Theoretically, the court could say, well, concealed carry, that is not as applied to concealed carry unconstitutional. But our focus has always been, as applied to open carry, it is. I honestly don't understand the answer to your question. I'm sorry, I'm not trying to be difficult. I understand you have a facial challenge. Yes. You have an as-applied challenge? And if so, can you just tell us which pages of the brief where we would look to see that described? We do not have an as-applied challenge to Mr. Baird's particular circumstances as a resident of a county of 200,000. On the open carry. Correct. I know you don't as to the licensing, but you don't as to the open carry criminal statute either. So we're just dealing with facial. That's what we're trying to figure out. Yeah, you know, it's linguistics here too. Well, it's not linguistics. It actually has pretty significant ramifications. But look, let's set this aside for a minute. As to the facial, we normally say in most contexts that you have to prove that it would be unconstitutional in all circumstances. Do you agree that that is the test that we apply for a facial challenge under the Second Amendment? Or is there more leniency in the Second Amendment? The majority below cited some case law that they were suggesting said, well, if it's at most. And I'm wondering if you agree with that or if you think you have to show in all circumstances. I know there was discussion in the panel decision and in the Wolford case about over-breath applying to Second Amendment challenges, which I would agree with. But that being said, I don't necessarily think because there's that's also subject to interpretation, right? Someone could say, well, I just want to all I'm asking you is what is the legal test you think you're bound by? Is it all or is it most? I think I'm bound by the Bruin decision and specifically whether the state can identify a longstanding national tradition that supports the statute. That's not my my question is as to facial versus as applied. You apparently have told us you don't have an as applied challenge. So as to facial, what is your legal test? I understand Bruin fits in there. But when we apply Bruin, do we have to say that Bruin applies and also it would prohibit this in all circumstances or just in most circumstances? In this case and the challenge to these statutes that in all circumstances, this statute would be unconstitutional. OK, and you think you meet that standard with respect to open carry? Yes, because that is our focus here. Yes, because it bans the actual right itself. It prohibits by criminal penalties the right to carry a loaded firearm in public and the right to carry. Well, it doesn't prohibit a right to carry in public. It prohibits a right to open carry in public, but you can carry. I mean, I guess you're using public as open because you can still carry it in public if it's concealed, right? No, you can't. No, you can't unless you apply for the shall issue permit and unless you apply for and are granted a license. But licensing and this is one of the points I wanted to get to. One of the errors in the district court was that the court treated the licensing exemption as though it negated the criminal penalties, which it does not. Can you say more about that? Sure. So the right to bear arms exists before the licensing, not because of it. So the period of time that an individual decides they would like to exercise that right, they can't. They're bound and prohibited under threat of criminal penalty until such time as they seek permission from the state and are granted permission. But then again, open carry in. I mean, under that theory, any licensing scheme would be unconstitutional in your view because even shall. You're basically saying if I have to go and ask for a permit, it's unconstitutional to apply it to me until I ask for a permit. That's not what Bruin said. So Bruin requires any regulation upon the Second Amendment right to have a longstanding national tradition. Licensing did not exist in 1791, the founding era, the ratification, and the state conceded that point in oral argument at the summary judgment level in page ER-115 beginning at line 18. But doesn't this get us back to the question Judge Miller asked about footnote 9? I'm sorry? I mean, you're going on about what Bruin should have said, not what Bruin did say because of footnote 9. Right. Well, footnote 9, so in Bruin, which is distinguishable in this respect, Bruin challenged a licensing scheme, not criminal penalties. The petitioners in Bruin conceded that licensing statutes and regimes were constitutional. And the footnote 9 language is a response to the oral argument transcript, the response to the petitioners' position at oral argument that they prefer New York had a shall issue regime that incorporated objective factors and not the may issue subjective licensing regime that they have. So it was dictum-based guidance arising from a party concession. It was not a holding. And, in fact, may I please? In fact, the licensing scheme, which wasn't challenged, was never subjected to the actual Bruin test. So it couldn't have resulted in a holding where they didn't apply their own test to it. So all the circuit courts that have spent a lot of pages on what footnote 9 means and what it doesn't mean, all of them are wrong? Well, I'm not really sure what context the challenges involve in those circuit courts. But I can say in this specific challenge, which is to a criminal statute, it's not holding. But why would it matter if it's a criminal statute or if it's a civil penalty? What's the distinction? Well, the issue, because criminal penalties cannot be applied to a natural right. But I assume the same would be a civil penalty. I mean, I think from your perspective, you're saying that there should be no restrictions, correct? I'm not saying, yeah. Whether it's a criminal or civil. Because licensing is not part of our national tradition. So open carry has never been subjected to licensing and should have no penalties. Right. But to be fair about that, footnote 9 says that it's a shall issue licensing scheme. So I'm trying to understand. It's a pretty big lightning bolt to throw in the court to say all of these circuits that have spent all this time trying to figure out what footnote 9 means. You're saying, well, we can just ignore footnote 9. I'm saying footnote 9 is very relevant and important to challenges to licensing schemes that continue to have discretionary factors and continue to be may issue as opposed to shall issue. It's an important footnote with respect to licensing schemes, which are predominantly and always have been affecting concealed carry. And so footnote 9, if used in a challenge to a particular part of a licensing regime, is extremely important because it gives the imprimatur to the objective shall issue schemes as opposed to the may issue schemes. But in the context of this particular case where we're talking about open carry, which has never been regulated or subject to licensing even. The licensing schemes came out in the late 1800s. They started out locally and then moved on to statewide licensing schemes. But they always remained concealed carry licensing schemes. Open carry has never been regulated in that respect. I realize that you are challenging this as a criminal penalty as opposed to the licensing scheme. But do you think that the licensure here is shall issue or are there subjective components in obtaining the license? I've been told that California has changed their licensing to shall issue for concealed carry. Since 2012, they've never issued an open carry license. So I'm not really sure how that would affect our challenge, even if we did agree that licensing was appropriate for open carry. But from what I understand, there have been changes to the concealed carry licensing scheme. Do you think it is now shall issue? As it applies to concealed carry, that's my understanding. The state was required to identify a longstanding national tradition, and it failed. There is no evidence in the historical record here of criminalizing peaceful public carry. There is no evidence of criminalizing open carry at all in any of the historical analogs or examples that have been provided by the state. And as I said before, licensing did not exist in 1791 as the state conceded. And when it did come around in the late 1800s, that was over a century after the ratification of the Second Amendment, which the Bruin Court has stated even 75 years after the ratification is just too remote in time if there is no previous indication that such a regulation has been adopted and made part of our national tradition. Why shouldn't we look to the Second Circuit's recent decision in Frey v. City of New York? Right, so the Frey case, which I also represent the plaintiffs in that case as well, the Second Circuit quoted the Bruin decision but added their own language to it, which really just was necessary to form the basis of their holding. The Bruin decision recognized that the handful of southern states that had passed laws against concealed carry, so they concluded that that established a tradition that states could regulate one form of concealed carry, one form of public carry-concealed carry. But what the Second Circuit did was they added in brackets open carry or concealed carry. And that just completely changed the conclusion that the court had reached, the Supreme Court, and it changed substantially the national tradition or the seven states in the South and the reasons why they had made their decisions about concealed carry. So in their holding, the Second Circuit was not adhering to the Supreme Court decision and they were not adhering to the tradition that was discussed with respect to the southern states. Did you want to reserve the balance of your time? I do. Thank you. Good afternoon, Your Honors, and may it please the Court, Samuel Harbert, on behalf of the California Attorney General. In Bruin, the Supreme Court decided that the state of California was not a state of the art,   and the Supreme Court recognized that states may impose licensing requirements on the public carry of firearms and that there is a longstanding tradition of states regulating the manner of carry without prohibiting public carry altogether. In our view, those principles resolve this case. The two statutes challenged here, Penal Code Section 25-850 and 26-350, impose a licensing requirement on the open carry of firearms. And far from prohibiting public carry altogether, California law allows for licensed concealed carry in every county across the state. How many licenses have been given for concealed carry? Do you know? For concealed carry? I'm not sure, Your Honor. Is it your understanding that we just have a facial challenge before us? That is our understanding. That was the District Court's understanding. For example, at page 17 of the excerpts of record, I think opposing counsel this afternoon acknowledged that Mr. Baird is seeking relief that's facial in nature. And that's as to both the licensing and the open carry provision. They're both just only facial. That is our understanding from, for instance, the prayer for relief in Baird's operative complaint. You can see that at pages 1456-57 of the excerpts of record. And it's seeking declaratory and injunctive relief as to those two challenge provisions of the penal code in their application to all individuals covered by those provisions, at least as to open carry as opposed to concealed carry. And what, in your view, is the standard? Does he have to show that it's unconstitutional in all circumstances? I mean, there's sort of this position that, well, look, this applies to 99.5. I mean, if you're in the largest county that's below 200,000, you could have it only in your county. I mean, is that enough to say that this covers everywhere? Or are you saying they just can't have a facial out of the gate because it doesn't apply in all circumstances? So a couple of important responses to that. First, we do think that standard is the Salerno standard, all applications. That's what the Supreme Court said in the Rahimi decision. That's consistent with, as Judge Smith noted in his panel dissent, consistent with the holdings of every other circuit that's looked at this. They've rejected the extension of the facial overbreath doctrine from the First Amendment context to the Second Amendment. The other response is that I don't think that the difference between overbreath or the Salerno standard would make a practical difference here, Your Honor, because I think the more direct response to Your Honor's question about the geographic restrictions is they're not constitutionally salient for the reasons provided by the Second Circuit in the Frye decision, which upheld a categorical statewide ban in New York on open carry. We think the court there got it absolutely right. And so as a constitutional matter, it would be permissible for California to ban open carry in all counties across the state. The fact that policymakers have chosen to allow those licenses in counties with populations under 200,000 does not give rise to a Second Amendment entitlement to an open carry license. So in your view, is concealed carry and open carry fungible? That is because California theoretically allows concealed carry can limit open carry. Is that the state's view? I think that is the practical consequence of our view. It's not exactly how I would state the legal analysis. The legal analysis looks to the historical tradition of that reflected by the analogs that we've relied on, the concealed carry prohibitions from the 19th century, as well as the going armed laws enacted in colonial times and thereafter. And Bruin looked at this same set of historical analogs. And its takeaway is that there's a tradition of regulating the manner of carry without prohibiting public carry altogether. If you look at the history, it's overwhelming that open carry was not regulated at all in the founding era or post-14th Amendment. There were some restrictions on concealed carry. So, I mean, shouldn't we at least give some deference to that historical tradition, given that it's unanimous, almost no restriction on open carry? And we kind of do that in other contexts. The First Amendment would give more protection to political core speech. I actually don't think there's historical basis for it, but I think our decisions claim it does, and we follow it. Kind of do that in the Fourth Amendment. Again, I don't think there's any historical basis, but we say, well, the Fourth Amendment was about the home, so we give more protection. Here, we actually have historical basis that says open carry was protected repeatedly. This is the way, if you're going to carry, you should carry it openly. I mean, shouldn't we give at least some deference to that? What I think you should do is follow the analysis adopted by Judge Smith and his panel dissent in the Second Circuit in the Fry decision, which said the purpose of Bruin and Rahimi's historical framework is not to freeze in place the precise policy decisions made by 18th and 19th century lawmakers. Rahimi is especially clear about this, that we're really looking for a broader principle reflected by those historical regulations. So the question is, what is the broader principle reflected by historical prohibitions, including the prohibitions Your Honor mentioned on concealed carry, which we agree were widely adopted? Bruin tells us that the answer is that states could permissibly regulate the manner of carry without prohibiting public carry altogether. Well, Bruin didn't address really – I mean, mentioned it. It wasn't really about public open carry versus concealed carry. It was over a Shell issue versus May issue. So they only mentioned concealed and open in looking at the historical tradition of regulation. In doing so, it says basically no regulation whatsoever on open carry during this area here. And again, if the history was a little bit more mixed, maybe the states are going to be better here. But it just seems – I don't think there's any regulation of open carry during the founding era or the post-14th Amendment. Right, but that's not dispositive. Under Bruin, and especially as clarified in Rahimi, where there was also no dead ringer or historical twin for the modern regulation challenged in that case. And Rahimi, I think, is especially instructive here because it was addressing a social problem that existed at the founding, domestic violence. And there were historical regimes that the court discussed, which were developed to address that particular problem, in particular the surety laws. And there was quite a lot of daylight between those historical statutes and the modern challenge regulation. But the court held that the modern regulation at issue in the case was still relevantly similar to those historical analogs, even though it wasn't a perfect one-to-one fit. And to your Honor's question about, you know, under the Second Amendment, do we focus on certain core aspects of the right as in the First Amendment context where we look at the burden on political speech? I think Bruin actually speaks to this. And it's a critical part of Bruin's analysis at page 29 of the decision where it emphasizes that our focus in undertaking the comparison of historical laws to the modern challenge regulation is on, and this is a quote from Bruin, the burden on the right of armed self-defense. So the core of the right recognized in Heller and Bruin was the right to armed self-defense. And I think that makes this case especially straightforward because California is providing a right to concealed carry in all counties across the state. And it's uncontested here that concealed carry is an effective mechanism for self-defense. I'd point your Honors to two places in the record on that. So at page 70, the district court discusses this and said there's no evidence to suggest that handguns are ineffective for self-defense when concealed. And then to Mr. Baird's First Amendment complaint, which is at page 1498 of the excerpts of record. I think it's worth reading his statement on this in full because it's highly relevant to this question of the ultimate impact on self-defense. He said, quote, concealed carry is the universally preferred method of law-abiding individuals, including plaintiffs, to carry a firearm for reasons including tactical advantage over an attacker, convenience of carry location, accessibility to one's firearm for self-defense, and practical considerations relating to one's wardrobe. So this is not a case where there is a significant or. But doesn't that depend? I understand your argument here, but doesn't that depend on how available concealed carry is? And that's why I asked you how easy is it to actually get it because there's some suggestion that it's not really that easy. I mean, and I so I mean, it's a little I'm wondering if it's a little bit misleading to say, hey, don't worry about it. You can get concealed carry when it's not really that easy to get concealed carry. Your Honor, I don't think it's misleading for a couple of reasons. For one, if you look at the statutes, 26-150 and 26-155 of California's Penal Code very clearly was amended in response to Bruin to be a shall issue licensing regime. It spells out objective considerations that bear on eligibility for a license. And I suppose what I'd say is I can imagine a hypothetical challenge to the features, the requirements for obtaining a license under California's post-Bruin shall issue licensing regime. And perhaps the development of it hasn't been brought in this case. If you'd like to look as just persuasive authority to an out-of-circuit decision that has addressed a claim along those lines, the Second Circuit's opinion in the Antoniuk case, page 120, F4th 941, it examined a challenge to New York's shall issue licensing regime, which is not in all respects identical to California's, but it is fairly similar. And it upheld it against this type of challenge that you're hypothesizing, Your Honor. But it seems like I'm asking a different question because it's not whether the shall issue is constitutional or not, but how available is it to actually get a gun? I mean, you could still have it be constitutional, and yet half the people don't comply with it, and it could be for a whole lot of reasons. Maybe there's other ways to get it. But here, if you're saying you cannot open carry, and your position is you can't open carry because you can conceal carry, then aren't those numbers relevant? I don't think so in a facial challenge where you're focusing on the text of the statute. So you look at the face of California's post-Bruin license. The argument would be that whatever those numbers are, even if in practicality only 10 percent of people who apply for it get the concealed carry, you can't tell that from the face of the regulation, and therefore we're fine. That's right, at least in a facial challenge of this nature. That would be an as-applied challenge. It would. So your argument is focused on the historical analysis and whether there were historical analogs for regulating the manner of carrying a firearm. So you haven't mentioned, and I'm assuming that you would agree, that the conducted issue, the proposed course of conduct, which is carrying handguns publicly for self-defense, does fall within the plain text of the Second Amendment. It is within the term BEAR. I mean, Bruin says that. Would you agree with that? We have not made a threshold textual argument as to BEAR's challenge to the restrictions on open carry licenses. We did, in our panel stage brief, present a threshold challenge as to Mr. BEAR's licensing claim. We don't think that because Bruin footnote 9 is just so clear that licensing schemes at least facially comport with the Second Amendment. We don't see a need to conduct a historical analysis as to licensing requirements. I'm sorry. So I'm looking at Bruin at page 32, and this is a quote. This definition of BEAR naturally encompasses public carry. So I don't think that that is fatal to your case at all, and it seemed as if your focus was on the second step, which is the historical analog. That's right. But I wanted to clarify, is that at play? Is that something that is in dispute and we have to determine whether the plain text of BEAR includes public carry? It's not in dispute in the briefing. We haven't made the threshold textual argument as to the restrictions on open carry licenses. We think that they are straightforwardly constitutional for the reasons provided by Judge Smith in dissent and the Second Circuit in the Frye decision, because there is this clear historical tradition discussed in Bruin itself of regulating the manner of carry. But we haven't made that threshold textual argument. I will note that Judge Smith in his panel dissent did offer a textual argument. We think it was reasonable, certainly credible. It's just it's not an argument that we advanced in our briefing. I think you just answered my question, because I went back and he relied on that specifically, but you never made that argument? We did not. Not even before the panel? No. Okay. What I would say respectfully is if the Court is considering adopting that textual rationale, we urge the Court to consider alternative holdings along the lines of this Court's en banc decision in Duncan, which adopted a threshold textual rationale for upholding California's restrictions on large-capacity magazines, but then also, out of an abundance of caution, turned to the historical analysis and upheld it on that ground as well. Could Your Honors just turn to the panel majority's opinion and highlight just a couple of areas where respectfully we view the analysis as flawed? So one is the assumption, and I think some of what I'm about to say is implicit in the discussion, in questioning this. Just highlighting a couple of areas where we respectfully disagree with the reasoning there. One is that the panel majority perceived a need to describe the relevant historical regulations at a fairly granular, specific level of generality. And as I mentioned to Judge Lee just a few moments ago, I think that that's inconsistent with the approach taken in the Rahimi decision. As well as highlighted by Justice Barrett, of course a member of the Bruin majority in her Rahimi concurrence, where she specifically warned against adopting too specific or narrow a level of generality, because what that does is it freezes in place. You mean too narrow of a level? It effectively freezes in place historical policies adopted. Maybe this just gets back to Judge Lee's questions, but it does seem like there's a difference between concealed carry and open carry historically. And it was a meaningful difference. One was regulated, one was not. That's really true. Why is it too general to say, or too specific to say, yeah, they can regulate concealed carry in a way that they cannot regulate open carry? Is there something that's changed over the last 200 years? I think there is something that's changed, although that's not our only basis. Have you advanced that argument? We have certainly in the record here described some of these historical changes, in particular of firearm technology. I point the court, for example, to Professor Cornell's expert report in pages 1348 to 49 of the excerpts of record, where he explains that firearms have changed in the sense that they are far more dangerous today, they're more accurate, they're more fast-loading. He describes how at the time that many of these historical provisions limiting concealed carry were adopted, firearms were generally muzzle loaders. They would take something like 30 or 40 seconds to load and reload. It's a far cry from modern semi-automatic weapons. And that does bear on the policy concerns, the public safety concerns, the risks, threats of interference with law enforcement that have led modern lawmakers, including California, to restrict open carry. But in California, the basis was actually less honorable. It was because Black Panthers in the 1960s were carrying guns publicly in the state capitol, so it was a racially discriminatory motivation. I don't think that gun technology changed so much immediately in the 1960s. Well, Your Honor, the provision enacted in 1967 on open carry in California has been amended, reenacted, expanded over 30 times in the ensuing decades. And I don't think there can be any serious dispute that California lawmakers, in particular when they enacted the last major expansion of the law in AB 144 in 2012, were motivated by legitimate public safety concerns, including the very serious threats of interference with law enforcement. I point the court to the excerpts of record, pages 1386 to 88, where Kim Rainey, former head of the California Police Chiefs Association, explained that there is this serious risk of interference with law enforcement, in particular in active shooting scenarios when police arrive at the scene and have to make very quick judgments, as Rainey said, about who the bad guys are and who the good guys are. If there are many people openly carrying firearms, that becomes a lot more complicated to make those quick and life-saving judgments. There are other rationales as well that we've discussed in our briefing. Well, I would almost assume concealed carry is more dangerous for police, because then they don't know where the risks are coming from and they have to make assumptions. And there are certainly different considerations that policymakers and law enforcement experts can balance, Your Honor, and there are some jurisdictions in the country that have authorized open carry. I will note, though, even in those jurisdictions, there are prominent dissenting voices that have criticized that policy decision. So, for example, in Texas, which is an open carry state, there's a survey showing that 75% of Texas police chiefs object to that policy and think that open carry should be banned. You can find that survey cited in the amicus brief of 15 states in the District of Columbia. It was filed a few weeks ago after the court granted en banc rehearing. More you wanted to point out to us about the majority opinion? I had turned to it dutifully. So one was the level of generality issue, and I think I've covered that. The other is that, respectfully, we submit that the panel majority did not make a serious effort to reconcile its analysis with the Supreme Court's approach in the Rahimi decision. Since I wasn't the panel majority, if I could address the Rahimi decision. Rahimi is a little bit different because it was about domestic violence, and at the founding era, unfortunately, it wasn't considered a crime. It didn't even enter the realm of that. It was a personal matter. So it was a question of how do we apply that when, in fact, in the founding era, they didn't even think about domestic violence. So the Supreme Court relied on surety laws, et cetera. Here, the historical evidence shows they did think about open carry versus concealed carry. So that was resolved as opposed to domestic violence where they didn't even think about it. So I do think it's different from Rahimi. So, Your Honor, I respectfully push back on the idea that people at the founding, the time of the adoption of the Second Amendment, were not thinking about domestic violence. The Rahimi majority actually says the opposite, that the surety laws were designed in part to address the risk of domestic violence. So there was a legal regime in place to address that social problem, and notably, it differed in pretty substantial ways, as Justice Thomas explained. It wasn't under criminal law. Domestic violence wasn't under criminal law. So a lot of it was trying to think how do we apply this here. I mean, the historical evidence is so clear here of how what we thought of, what the framers thought of, of concealed carry versus open carry. The historical evidence is so much clearer than in Rahimi where we're trying to think, well, let's apply our modern standards, how that would have applied. And in that sense, we don't want to trap it in amber, as some of the decisions put it. In the trap in amber quote was exactly where I was going to go, where even if there was a very clear tradition with respect to concealed carry in the 18th and 19th centuries, there's no basis in the Bruin or Rahimi framework to trap that specific policy preference in amber and freeze it in place for all time. And I just note, too, that the historical analogs we're relying on with respect to California's restrictions on open carry are not limited to the concealed carry prohibitions. So I think it would be a little bit too simple to suggest that there's just been this complete flip or transposition in policy preferences over time. We're also pointing to the going armed laws, which were discussed in Bruin and in Rahimi, descended from the British statute of Northampton, and were widely adopted as a matter of common law or by statute in colonial times or early post-independence America. And they're relevant here because they prohibited the open carry or display of firearms in ways that threatened fear or terror on the part of the public. They weren't identical by any means to California's modern restrictions on open carry. They were relevantly similar for purposes of Bruin's inquiry. And then if I could just briefly, Your Honors, I wanted to respond to some of the concerns that Judge Lee raised in his concurring opinion at the panel stage about the licensing form used to apply for concealed or open carry licenses in California. As we explained at our panel stage argument, the form is available. It can be used for either type of license, at least in counties where open carry licenses are lawful. That being said, we understand the concerns raised by Judge Lee. We have taken steps to initiate the statutory process under Penal Code Section 26-175 for revising the form. Requires convening a committee of representatives of the Attorney General and local licensing officials. We've sent the letter to get that process started. We anticipate that a revised form will be adopted by September 1st of this year, and it will make it even clearer that the application form can be used for open carry licenses. But that hasn't been changed yet. In your view, can we consider that as part of the facial challenge, or do you view that as just a side issue because it's not part of the statute? I think it's just a side issue. I just wanted to respond to serious concerns that a member of the Court had raised in a separate opinion. If there are no further questions, Your Honors, we respectfully ask the Court to affirm the District Court's judgment. Thank you. So with regard to the public safety concerns that were expressed by the State, the Supreme Court has been very clear that the interest balancing took place at the time that the Second Amendment was ratified. So this Court respectfully cannot consider public safety concerns and the issues that have been raised by the State when rendering its decision. I will also mention that there are already statutes in place for preventing or punishing the possession of firearms by prohibited persons, felons, convicted felons, drug addicts, and so forth. And with respect to concealed carry, there is a licensing scheme for that as well. With respect to the manner of carry, while I do see how open versus concealed carry can be considered a manner of carry restriction, historically, and again, I'll just point to the fact that this delineation between open carry and concealed carry was limited to a period in time from 1822 to 1850. By a handful of southern states, that by the time 1850 rolled around, there were 31 states in the United States, so that that cluster of states didn't even rise to a 25% make-up of the states. Arguably, it's not even a national tradition. But assuming that it is, in deciding whether – I would say that the statutes in that case, in those cases, do not apply. The statutes in those cases really were regulating concealable weapons, weapons that were considered dangerous and unusual. There's language in the statutes that supports that. Pistols were – or pocket pistols, breast pistols were considered dangerous and unusual at the time. They are no longer considered dangerous and unusual, obviously. But manner of carry really, historically, has pertained to the Afrae laws, which are comparable to the present-day Afrae laws. The present-day brandishing or menacing, where someone is acting in the case, the statute of Northampton, which has been disregarded by the Supreme Court more than once, as not being analogous to peaceful public carry, which is what we're advocating here. Peaceful open carry, the Afrae statutes aren't analogous to that. When we talk about Rahimi, the court was very clear in indicating that the how and the why of the regulation is central to the inquiry, the constitutional inquiry. And the why of the regulations that were imposed on concealed carry by the southern states was the dangerousness of concealed carry. That only people who were engaging in criminal acts and had a criminal mens rea would conceal carry, because gentlemen would open carry. They would allow you to know that they were carrying a weapon and they weren't trying to – I think one of the cases involved an assassination by an individual who had been carrying the weapon concealed. So that was frowned upon by the southern states. So when we talk about the broader principle, that's really what is underlying that regulation. That's what's underlying that tradition. Open carry had no negative context and never has had any negative context. In fact, from the time that California became a state in 1850, for the next 117 years, open carry was unregulated. It was not licensed. It wasn't subject to criminal penalties until 1967. So, counsel, not to interrupt the train of thought, but why can we look to that level of specificity? I mean, California is saying you're asking for too close of an analog. Why do you think that fits within Bruin and Rahimi, these differences? I think it's very broad. I don't think it's narrow at all. It's carry. It's bare arms. Heller defined bearing arms as both concealed and open carry, to wear upon the person or in the pocket or, you know, in a – I can't remember the word exactly, but it specifically does – Heller specifically does mention in referencing the Muscarello case, wearing upon the person or in the pocket, which would encompass open carry. But if we're looking to a point in time in history where such delineation was made, which did not exist in 1791, and if you look at the Bliss v. Kentucky case, it recognizes that at the time that Kentucky statute was passed, concealed carry wasn't illegal at all. Open and concealed were both legal. But when we're looking at the generality of bearing arms, I don't think that it's very specific to say that concealed carry was the manner that was frowned upon and that open carry was the accepted manner of bearing arms at the time and has been throughout history in this nation. The state hasn't identified one statute that regulates open carry at all. Or one criminal statute, one licensing statute, nothing. And so there is no historical analog for this criminal statute. I just can't come to terms with how a decision can be made that upholds these two criminal statutes when there is zero historical analog for either. You said that for 117 years or so California did not ban open carry. Did California regulator ban concealed carry during that period? They did, yes. And the licensing schemes of the time in the late 1800s and early 1900s licensed concealed carry. So that tradition did continue. And I would just say if, as the southern state cases indicated, they were concerned with the norms of the time, that the view of concealed carry was an evil practice. So they banished it and lauded open carry or upheld open carry as unregulated. Today we have the exact opposite. We have the state saying, well, the norms of the time are concealed carry and not open carry because it's going to frighten people. And that just leaves us with no protected right at all if the government can just flip-flop on exactly what the right means. And Bruin said that the meaning of the right is pinned to the point in time that it was ratified in 1791. And I submit to you that if at all, open carry is the right historically that has been protected. And I ask that judgment be entered in favor of Mr. Baird and that these two statutes, 5850, be enjoined as to open carry and that 2635 be enjoined as to open carry. And I ask that judgment be entered in favor of Mr. Baird and that these two statutes, 5850, be enjoined in its entirety. Thank you. Ms. Bellin-Toney and Mr. Harbaugh, we appreciate your argument presentations here today. The case of Mark Baird v. Rob Monta is now submitted and we are adjourned. Thank you.
judges: MURGUIA, SMITH, CHRISTEN, NGUYEN, OWENS, FRIEDLAND, NELSON, MILLER, BADE, LEE, ALBA